IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| SHAUN WAYNE WILES, #2K5248, | )<br>)<br>) |
| Plaintiff, | ) Civil Action No. 0:05-2111-CMC-BM |
| v. | )<br>)<br>) |
| JON E. OZMINT, SOUTH CAROLINA DEPARTMENT OF CORRECTIONS, AND BERNARD MCKIE, | )<br>) **REPORT AND RECOMMENDATION**<br>)<br>)<br>)<br>) |
| Defendants. | ) |

This action has been filed by the Plaintiff, pro se, pursuant to 42 U.S.C. § 1983. Plaintiff, who at the time this action was filed was a Jasper County pretrial detainee being housed with the South Carolina Department of Corrections (SCDC) for "safekeeping" purposes, alleges violations of his constitutional rights. Plaintiff filed an amended complaint on December 20, 2005, and a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P., on December 21, 2005.

The Defendants filed an answer to the amended Complaint, and thereafter filed their own motion for summary judgment on January 30, 2006 together with a response to the Plaintiff's motion for summary judgment. As the Plaintiff is proceeding pro se, a Roseboro order was entered by the Court on February 1, 2006, advising Plaintiff of the importance of the Defendants' motion

1



for summary judgment and of the need for him to file an adequate response. Plaintiff was specifically advised that if he failed to respond adequately, the Defendants' motion may be granted. Plaintiff then filed a memorandum in opposition to the Defendants' motion, with attached exhibits, on March 23, 2006, to which the Defendants filed a reply memorandum on April 3, 2006.[1] Plaintiff was provided the opportunity to file a reply to the Defendants' reply, but failed to do so. See Order (Court Document No. 44).

These motions are now before the Court for disposition.[2]

**Background and Evidence**

Plaintiff alleges in his amended Complaint[3] that since he has been housed in the Maximum Security Unit (MSU) at the Kirkland Correctional Institution (KCI), he has not been able to receive pictures of his family and friends, which has caused him "mental anguish, pain and suffering." Plaintiff also complains that he has not been able to see family members under the age of eighteen (18) because they cannot visit him in the MSU, and that he has been told that he will "always be housed in MSU."

Plaintiff also alleges that he has not been able to receive religious, educational or

---

[1] Plaintiff also filed a motion for a temporary restraining order and/or preliminary injunction on March 24, 2006, to which the Defendants filed a memorandum in opposition on April 11, 2006.

[2] This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d) and (e), D.S.C. The parties have filed motions for summary judgment. As these are dispositive motions, this Report and Recommendation is entered for review by the Court.

[3] In this Circuit, verified complaints by pro se prisoners are to be considered as affidavits and may, standing alone, defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). However, in this case the Plaintiff's amended Complaint is an *unverified* Complaint. Therefore, the undersigned has not considered the factual allegations set forth in the unverified Complaint as evidence in issuing a recommendation in this case.

2



recreational publications in the mail from publishers since he has been in the MSU. Plaintiff complains that SCDC policy allows MSU inmates to continue to receive periodical subscriptions that were purchased and paid for prior to their admission to the MSU until the subscription expires, that no subscriptions may be renewed, and are otherwise only allowed to have in their possession the number of paperback books or periodicals authorized by prison policy. Plaintiff complains that he has already read most of the books and magazines that are brought around on the "cart" every Sunday, and that in any event these publications "are at least a year and a half old." Plaintiff alleges that this interference with his correspondence "continues to harm [his] attempts at self-rehabilitation", and is causing him mental anguish and lowering his self esteem.

Plaintiff also complains that a light in his cell is on twenty-four (24) hours, seven (7) days a week, which "continues to cause [him] mental anguish pain and suffering." Plaintiff complains that this has also interfered with his "sleep/wake-up cycle", but that he was advised by the Defendant McKie that a light has to remain on in his cell for security reasons.

Finally, Plaintiff complains that when he goes out for recreation he is stripped searched and put in belly chain restraints, leg restraints, and a "blackbox" restraint. Plaintiff complains that these restraints inflict "physical pain and undue physical discomfort", and that it is impossible to get any recreation or exercise when he is in these restraints, again causing "mental anguish, pain and suffering." Plaintiff alleges that the Defendant McKie has told him that he will remain in the blackbox restraints for security reasons.

Plaintiff seeks an order and/or ruling from this Court that he be allowed to receive pictures of his family in the mail, that he be allowed to receive religious, educational and recreational publications in the mail from publishers, that the light in his cell be turned off from 9:00



p.m. to 6:00 a.m., and that the blackbox restraints not be put on him when he goes to recreation, with the belly chain restraints being removed after he is placed in the secured recreation cage. See generally, Complaint, with attached Exhibits (Grievance Forms). Plaintiff has also attached copies of his grievance forms to his motion for summary judgment.

In support of summary judgment in the case, the Defendant McKie has submitted an affidavit wherein he attests that he is the Warden at KCI. McKie attests that Plaintiff is housed in the MSU, which is a specialized housing unit for inmates who have demonstrated an unwillingness to conform to the rules and regulations, who have been charged with violent criminal behavior committed while in the general population, and/or for whom emergency placement has been ordered by the Agency Director or the Deputy Director for Operations. McKie attests that the MSU typically houses some of the worst inmates in the SCDC, and that the MSU's operation is governed by SCDC Policy No. OP-22.11, a true and accurate copy of which is attached to his affidavit as Exhibit A.

McKie further attests that Plaintiff is well known escape risk. McKie attests that during a previous incarceration, Plaintiff was convicted of an escape attempt from the Ridgeland Correctional Institution on October 12, 2002, that he later successfully escaped from the Ridgeland Correctional Institution on November 19, 2003, and then again on December 19, 2003. McKie attests that on July 28, 2005, Plaintiff pled guilty to two counts of escape and was sentenced to two consecutive one year sentences. True and accurate copies of the SCDC Escape/APB reports and Escape Apprehension reports for both escapes, an affidavit describing the November 19, 2003 escape, and the guilty pleas and sentences issued on the two escape charges are attached to McKie's affidavit as Exhibit B.



McKie attests that after Plaintiff's recapture on December 26, 2003, he was assigned to the MSU as an emergency admission because of his escape history, and that a true and accurate copy of this MSU Review Committee decision is attached to his affidavit as Exhibit C. McKie attests that Plaintiff remained in the MSU until he maxed out his sentence and was released from the SCDC on April 1, 2005, but that during that previous placement, Plaintiff escaped from the MSU on April 4, 2004 and was apprehended while still on the roof of the facility. A true and accurate copy of the incident report and disciplinary report for the Plaintiff's attempted escape from the MSU are attached to McKie's affidavit as Exhibit D.

McKie attests that after Plaintiff's release from the SCDC on April 1, 2005, Plaintiff was transferred to the Jasper County Detention Center on a detainer, and that Plaintiff thereafter attempted to escape from that facility on April 4, 2005. McKie attests that, at the request of the Jasper County Sheriff and the Fourteenth Circuit Solicitor, the Governor approved Plaintiff's transfer to the SCDC as a "safekeeper" inmate, and that Plaintiff was transferred on April 20, 2005 and was assigned to the MSU. A true and accurate copy of the records supporting Plaintiff's transfer are attached to McKie's affidavit as Exhibit E. McKie attests that since Plaintiff's convictions on July 28, 2005, he has remained in the MSU.

McKie attests that because of Plaintiff's extensive escape record and history, he was placed in an observation cell where he can be electronically monitored twenty-four (24) hours a day. McKie attests that in order to allow for such surveillance and to prevent any night time escape activity (as Plaintiff has done in the past), his cell must be kept continuously lighted. McKie further attests that the SCDC manages the behavior of MSU inmates by using a level system to encourage and reward appropriate behavior, with Level III inmates having the most privileges, and Level I the

5



fewest privileges. McKie attests that Plaintiff is presently a Level III inmate. McKie attests that the SCDC has very limited means to encourage and promote discipline within the MSU given the nature of the unit and the restricted privileges already available, and that by imposing incremental disadvantages, such as limiting books and periodicals for bad behavior, the correctional goal is to modify the behavior that has lead to the inmate's assignment to the MSU. McKie attests that among the privileges used as part of this level system are the restrictions on books and periodicals Plaintiff complains about in this lawsuit, and that these limitations serve to promote better behavior and discipline, which is an important and necessary reason for the policy.

McKie attests that pursuant to ¶ 13.1 of Policy OP-22.11, Plaintiff was able to continue to receive any periodical subscriptions paid for prior to his admission to the MSU until the subscription expired, but that he has not been allowed to renew any subscription while in the MSU. Nevertheless, as a Level III inmate, Plaintiff is currently allowed possession of three books or periodicals at a time, and many books and periodicals are available to MSU inmates from the KCI library. McKie attests that these books and periodicals are made available from a book cart in the MSU, may be interchanged at least weekly, and that efforts are made to change or update the books and periodicals available on the book cart depending upon the contributions received from local libraries and similar sources. Further, Plaintiff is allowed to possess a primary religious book, such as a Bible or Qur'an, and is also allowed access to legal books and materials. McKie attests that legal materials are available to the Plaintiff on request on Monday, Wednesday, and Friday.

McKie attests that one reason for the limitations on books and publications is that inmates in the MSU have limited places to hide weapons and contraband, and that by limiting the opportunity for inmates to hide weapons and contraband, the SCDC can provide a more secure and

6



safe environment for other inmates and staff.  Further, books and publications represent a fire hazard in a prison environment, especially in a lock up unit like an MSU.  McKie attests that fires that have occurred in the MSU in the past have presented a difficult challenge for the Department to prevent injury to inmates and staff and damage to KCI.

Finally, McKie attests that, with respect to Plaintiff's complaint about the ban on photographs, that ¶ 13.3 of Policy No. OP-22.11 provides that no photographs are allowed in the MSU.  McKie attests that the possession of personal photographs is another privilege that has been denied to MSU inmates, but which inmates in the general population and other units are allowed. McKie attests that this ban on photographs encourages MSU inmates to correct their behavior in order to obtain their release from the MSU to a less restrictive unit where privileges, such as the possession of personal photographs, are allowed.  McKie further attests that, in addition to serving as an incentive for current MSU inmates to adjust their behavior, the restrictive environment in the MSU also serves as a deterrent for other inmates to adjust their behavior and conduct in order to avoid placement in the MSU, and therefore fosters discipline and order throughout the system. See generally, McKie Affidavit with attached Exhibits.

The Defendants have also submitted an affidavit from Gary Lane, who attests that he is a captain at the KCI/MSU.  Lane attests that he is in charge of operations and security in the MSU, and is very familiar with the policies and procedures implemented to maintain security in the MSU as well as the day to day functioning of that facility.  Lane attests that SCDC Policy No. OP-22.11, ¶ 21, provides that "[i]nmates in all MSU levels will be restrained with leg irons, security cuffs, and/or belly chains with black box (hobble chain may be attached) with a leader chain attached whenever exiting their cells or when the cell door is unlocked." Lane attests that this policy

7



requires that all MSU inmates be placed in handcuffs, belly chains and leg shackles at any time the inmate is outside their cell, including out of cell recreation. Lane attests that, in addition to the security cuffs, a black box device is utilized to cover the handcuffs to prevent any access to the locking mechanism of the handcuffs. Lane attests that, although this equipment is used on all MSU inmates, this feature is particularly needed for inmates such as the Plaintiff, who has demonstrated a propensity for escape activities. The black box prevents any attempts to pick or tamper with the locking mechanism of the cuffs.

    Lane attests that MSU inmates are normally allowed one hour of outside recreation each day, five days per week, weather permitting. While on recreation, the inmates are placed in outside recreational areas and are restrained as described so that the MSU can meet its penalogical objective of controlling the worst prisoners in the corrections system and maintaining strict order. Lane attests that it would be impractical, disruptive, and dangerous to release MSU inmates from restraints during out of cell recreation times because MSU officers would be required to restrain them following recreation, and that because officers often have difficulty restraining an inmate when he is confined to a cell, it would be even more difficult to restrain an inmate in a larger recreational area. Lane attests that it is not uncommon for MSU inmates to refuse a direct order in their cells to come to the cell door to be placed in restraints, and that in such situations it is often necessary to use chemical munitions to compel an inmate's compliance. On a recreation yard, which is outdoors and open, MSU officers would be unable to effectively use chemical munitions in the same manner if an inmate refused a direct order to come to the door to be restrained. In such an event, Lane attests that it would be necessary to use the Force Cell Movement Team to extract a non-compliant inmate from the recreation area, which would put both the inmate and the officers at risk of bodily injury.



Lane further attests that the restraints, including the use of the black box, do not prevent inmates from receiving some exercise and other recreational benefits, because even while in restraints inmates can move sufficiently to accomplish the goals of the recreation/exercise time. Lane further notes that outdoor recreation is not the only recreation or exercise opportunities that an MSU inmate has; that when in their individual cells, inmates are not restrained and have sufficient room to exercise, including sit ups, push ups, and other calisthenics. Inmates are also provided instructions for in cell exercise, and the use of restraints while out of their cells therefore does not prevent MSU inmates from receiving sufficient exercise opportunities.

Lane attests that Plaintiff has been assigned to one of the observation cells because of his past escape history, that he is recognized as an escape risk, and that as a result the correctional staff has taken precautionary measures to lessen that risk. Lane attests that one of the precautionary measures taken is subjecting Plaintiff to electronic surveillance twenty-four hours a day. Lane attests that when Plaintiff was previously assigned to the MSU and successfully escaped from that unit, he worked at night to saw through the window of his cell and that such activity was undetected because of the darkness of his cell. Lane attests that in order to prevent Plaintiff from having the same opportunity for escape activities and to allow for the electronic surveillance, it is necessary for his cell to remain illuminated continuously. Lane attests that those measures are currently in place for only the Plaintiff and one other inmate, both of whom are the only two inmates to have successfully escaped in the past from the Maximum Security Unit. Lane attests that Plaintiff has been and continues to be able to sleep under his current conditions, and that he has not observed any evidence that Plaintiff is deprived of sufficient sleep. Lane attests that it is common for MSU inmates to sleep regardless of whether the lights are on or off in the unit, and that Plaintiff is no



exception.

Finally, Lane attests that the MSU uses a level system whereby inmates receive different privileges based upon what level of behavior they have achieved, and that Plaintiff is currently at Level III, the highest level. Lane attests that a Level III inmate has television privileges twenty-four hours per day, seven days a week, and that for three hours each day these in-cell televisions show only educational and religious programming. For the remaining time, inmates can watch commercial television. Lane attests that inmates may, as a result, keep up to date with local and world events by watching television programs such as news programs. See generally, Lane Affidavit.

As attachments to his response to the Defendants' motion for summary judgment, Plaintiff has presented copies of grievance forms he has filed with respect to the light being kept on in his cell (Plaintiff's Exhibit C); a copy of SCDC Policy OP-22.15 (Plaintiff's Exhibit D); and an affidavit from a fellow inmate (Bar-None-Royal Blackness)[4], in which this inmate attests that when Laurie Bessinger was Warden for the KCI/MSU through 2003, he was allowed to have photographs in his possession in his MSU cell for nine years without incident, but that when the Defendant McKie became Warden, he issued a memorandum stating that as of February 1, 2004, no photographs would be allowed inside the MSU, with this policy being adopted as part of SCDC Policy OP-22II, ¶ 13.3. Blackness further attests that he has witnessed Plaintiff struggling to walk in his mechanical restraints and falling on one occasion, and has also witnessed Plaintiff complaining about the light being left on in his cell.

---

[4] This inmate, whose real name is Kevin Smith, is a frequent filer of litigation in this Court. Aloe Creme Laboratories, Inc. v. Francine Co., 425 F.2d 1295, 1296 (5th Cir. 1970) [This Court may take judicial notice of its own records.].



Plaintiff has also provided affidavits from several other inmates, in which they complain about the restraints at issue, not being able to receive photographs, or about the lights being kept on. These inmates also state generally that they were unaware of the conditions in the MSU until they were assigned to that unit. See generally, Affidavits of Jeffrey Motts, James Flemming, James Strong, Mark Houston, Ron Nicholas, and Roy Lindsey.

Plaintiff has also provided his own affidavit, wherein he attests that he has been incarcerated in the KCI/MSU since April 20, 2005, and that the lights being on twenty-four hours a day "is interfering massively with my sleep/wake-up cycle and causing sleep deprivation. Its causing me to become very disoriented, and causing me severe headaches, memory lost and problems with concentration." Plaintiff further attests that before being placed in the MSU he knew nothing of MSU policies, and did not know that inmates in the MSU could not have photographs or couldn't order publications from publishers. Plaintiff attests that not being able to receive photographs of his family is affecting his communication and emotional bonds with this family, causing him mental anguish, pain and suffering. Finally, Plaintiff attests that he cannot get any significant exercise while wearing the black box restraints, which cause pain in his wrists and ankles. Plaintiff attests that these restraints further deter him from going to recreation and getting the needed physical and mental effects that recreation provides. See generally, Plaintiff's Affidavit.

As attachments to their reply memorandum, Defendants have submitted an affidavit from Donna Curry, who attests that she is employed with the Office of Health Information Resources at the SCDC, and that in this capacity she has obtained the Plaintiff's medical records from April 2005 through the present date, which she has attached to her affidavit as Exhibit A.



**<u>Discussion</u>**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Rule 56(c), Fed.R.Civ.P.  The moving party has the burden of proving that judgment on the pleadings is appropriate.  Once the moving party makes this showing, however, the opposing party must respond to the motion with "specific facts showing there is a genuine issue for trial."  Rule 56(e), Fed.R.Civ.P.   Further, while the Federal Court is charged with liberally construing a complaint filed by a <u>pro se</u> litigant to allow the development of a potentially meritorious case, <u>see</u> <u>Cruz v. Beto</u>, 405 U.S. 319 (1972); <u>Haines v. Kerner</u>, 404 U.S. 519 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a Federal claim, nor can the Court assume the existence of a genuine issue of material fact where none exists. <u>Weller v. Dep't of Social Services</u>, 901 F.2d 387 (4th Cir. 1990).

After careful consideration of the arguments and evidence presented, the undersigned finds and concludes that the Defendants are entitled to summary judgment in this case. It is known from other cases previously decided in this judicial district that South Carolina law confers no protected liberty interest upon inmates of the South Carolina Department of Corrections from being placed in administrative segregation or any particular prison.  <u>See</u> <u>e.g.</u>, <u>Keeler v. Pea</u>, 782 F.Supp. 42, 43-44 (D.S.C. 1992), (citing <u>Meachum v. Fano</u>, 427 U.S. 215 (1976)). <u>See</u> <u>also</u> <u>Vice v. Harvey</u>, 458 F.Supp. 1031, 1034 (D.S.C. 1978).   In fact, it is well settled that the placement of inmates into administrative segregation units or similar units is a valid means of minimizing a "threat to security



of the institution, threat to the safety of other residents or Jail staff, etc." Jackson v. Bostick, 760 F.Supp. 524, 528 (D.Md. 1991). See also Hewitt v. Helms, 459 U.S. 460, 468 (1983); Anderson v. County of Kern, 45 F.3d 1310, 1312 (9th Cir. 1995); Montanye v. Haymes, 427 U.S. 236, 242 (1976) [if a prisoner's confinement is within terms of the sentence imposed upon him and does not violate other constitutional provisions, "the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight"].

Further, prison officials are given wide ranging deference with respect to custody conditions for maximum security inmates. Anderson, 45 F.3d at 1316 [Prison officials have legitimate penological interests in Administrative Segregation, and they must be given "wide-ranging deference" with respect to their need to maintain order, discipline, and "institutional security"], reh'd denied, 75 F.3d 448 (9th Cir. 1995), cert. denied, County of Kern v. Anderson, 116 S.Ct. 306 (1995). Unless Plaintiff has presented evidence sufficient to create a genuine issue of fact as to whether any of the policies complained of in his Complaint amount to a constitutional violation when considered under these standards, summary judgment is appropriate. See generally Sweet v. South Carolina Department of Corrections, 529 F.2d 854, 859 (4th Cir. 1975) (en banc) [describing federal court's deference to prison administrators and all administrative matters unless the condition rises to the level of a constitutional violation]. [5] He has failed to do so.

As noted in the evidence, the MSU is where the worst inmates in the prison system

---

[5]Since Plaintiff was apparently a pretrial detainee during at least some of the time period at issue, his claims with respect to that period of time would be governed by the Fourteenth Amendment, not the Eighth Amendment. See Belcher v. Oliver, 898 F.2d 32, 34 (4th Cir. 1990). This distinction does not save Plaintiff's claim, however, as "[t]he Fourteenth Amendment right of pretrial detainees, like the Eighth Amendment right of convicted prisoners, [both] require[ ] that government officials not be deliberately indifferent to any serious...needs of the detainee." Belcher, 898 F.2d at 34.

13



are housed. In such an environment, restraints on an inmate's liberty and freedom of movement should be expected, as should other restrictions on the inmate's activities and privileges. *Cf.* Daigre v. Maggio, 719 F.2d 1310, 1313 (5th Cir. 1983) ["[S]olitary confinement is a disciplinary measure whose very essence is the deprivation of interests the first amendment protects....To promote the important government interest in maintaining discipline, officials must have available sanctions that impose incremental disadvantages on those already imprisoned"]. As long as restrictions or regulations placed on MSU inmates are reasonably related to a legitimate penalogical objective, they should be upheld by the courts. Turner v. Safley, 482 U.S. 78, 89 (1987) ["...when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penalogical interests"]. In order to determine if a regulation is "reasonably related to legitimate penalogical interests", courts look to whether the regulation is rationally related to a legitimate and neutral government objective, whether there are alternative avenues that remain open to the inmates to exercise the right, the impact that accommodating the asserted right would have on other guards and prisoners and on the allocation of prison resources, and whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials. Turner, 482 U.S. at 89-90. Significantly, the burden is on the prisoner to disprove the validity of the prison regulations at issue. Overton v. Bazzetta, 539 U.S. 126, 132 (2003). Here, Plaintiff has failed to show that the regulations and policies at issue in this case are not reasonably related to legitimate penalogical interests under the standard of Turner and its progeny.

First, the need for physical restraints while Plaintiff is in the recreation yard are readily apparent from the evidence presented, as is the necessity of the light being on in his cell.

14



The record shows that Plaintiff has a lengthy escape history, including escapes and/or escape attempts from the MSU itself. Plaintiff can hardly complain about the Defendants' conclusions that he needs to be maintained in restraints while outside of his cell, and monitored full time even when he is in his cell, when he has given them such good cause to be concerned about his actions. Further, as correctly noted by the Defendants, the restraint policy at issue has previously been upheld by this Court, and by the Fourth Circuit Court of Appeals. See Caprood v. Moore, 188 F.3d 501 (4th Cir. 1999) (table); Zulu X v. Catoe, C/A No. 4:94-1898-3BE. See also Chavis v. Fairman, No. 94-1503, 1995 WL 156599 at * 5-6 (7th Cir. Apr. 6, 1995) ["Generally, even dramatic restrictions on outdoor exercise do not violate [the due process clause] so long as prisoners have ample opportunity to enjoy indoor activity"]. Use of "blackbox" restraints has also been upheld by the Courts. See Fulford v. King, 692 F.2d 11 (5th Cir. 1982); Knox v. McGinnis, 998 F.2d 1405 (7th Cir. 1993) [qualified immunity]; Moody v. Proctor, 986 F.2d 239 (8th Cir. 1993); Morissette v. Godinez, No. 94-1475, 1996 WL 681378 (7th Cir. Nov. 19, 1996); McLaurin v. Hofbauer, No. 93-1628, 1993 WL 473694 (6th Cir. Nov. 15, 1993).

      In any event, Plaintiff has presented no evidence whatsoever to substantiate his general and conclusory claims of physical harm as a result of either the use of physical restraints or because of the illumination of his cell. See Papasan v. Allain, 478 U.S. 265, 286 (1986)[Courts need not assume the truth of legal conclusions couched as factual allegations.]; Bender v. Suburban Hospital, Inc., 159 F.3d 186 (4th Cir. 1998); Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987)["Even though pro se litigants are held to less stringent pleading standards than attorneys the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"]. Conversely, Defendants have submitted Plaintiff's medical records, which do not

15



support Plaintiff's complaints of sleep deprivation, fatigue, or related ailments, nor is there any evidence of Plaintiff ever having been treated for sleep deprivation, fatigue, or related ailments, or for any physical harm suffered as a result of the physical restraints he wears when outside of his cell. Strickler v. Waters, 989 F.2d 1375, 1381 (4th Cir. 1993) ["In order to withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions]; Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995) ["In the context of a conditions-of-confinement claim, to demonstrate that a deprivation is extreme enough to satisfy the objective component of an Eighth Amendment claim, a prisoner must 'produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions', or demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions"]. This claim is without merit.

With respect to Plaintiff's complaints about the receipt of publications through the mail and general restrictions on visitation privileges, the Defendants' evidence reflects the motivations and rationale behind these policies, and Defendants again point out that these specific policies have already been upheld by the courts of this District and Circuit. See Corey v. Reich, No. 02-2801, 2004 WL 3090234, aff'd, 2004 WL 1730327 (4th Cir. 2004), cert. denied, 544 U.S. 924 (2005); Incumaa v. Ozmint, C/A No. 0:03-2776-22BD; Strong v. Ozmint, C/A No. 2:03-2256-24AJ, 106 Fed.Appx. 836 (4th Cir. Aug. 11, 2004); see also Daigre, 719 F.2d at 1313 ["To promote the important government interest in maintaining discipline, officials must have available sanctions that impose incremental disadvantages on those already in prison. Left free to write to anyone in the world and to receive literature of any kind, a prisoner might find punitive isolation desirable,



offering solitude and leisure as an alternative to the ordinary conditions of prison work and life. Thus, a narrower restriction on first amendment interests would likely prove ineffective in maintaining discipline"]; Gregory v. Auger, 768 F.2d 287, 290 (8th Cir. 1985) [restrictions on certain types of correspondence, including junk mail, newspapers and magazines serve a legitimate penalogical objective of "deterrence of future infractions of prison rules"]; Overton, 539 U.S. at 134 ["Withdrawing visitation privileges is a proper and even necessary management technique to induce compliance with the rules of inmate behavior, especially for high- security prisoners who have few other privileges to lose"].[6]

Finally, with respect to Plaintiff's claim regarding the restriction on photographs being allowed in MSU cells, it is readily apparent that the penalogical interests served by the photograph policy are the same as those served by the publications and visitation policies previously discussed. Plaintiff's own statements as to why he wants photographs in his cell reinforce Defendants' contention that the policy denying such photographs serves as a valid incentive for Plaintiff to modify his behavior to obtain release back to a less restrictive facility, where he would be allowed to possess the photographs he seeks. *Cf.* Vasquez v. Frank, No. 05-528, 2005 WL 2740894 at *12 (W.D.Wisc. 2005) ["[R]estrictions on a[n] inmate's receipt of...photographs as part of an incentive program were reasonably related to the prison's legitimate interest in promoting good behavior"]; see also Ramirez v. McCaughtry, No. 04-335, 2005 WL 2010173 (W.D.Wisc. 2005) [upholding policy that restricted access to newspapers, magazines, and photographs to inmates in segregation as part of an incentive system for good behavior]; see In re Long Term Administrative

---

[6]The undersigned also notes that the evidence specifically shows that, notwithstanding these restrictions, Plaintiff has literature made available to him on a regular basis, as well as religious materials and access to legal materials. See McKie Affidavit.

17



Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 469 (4th Cir. 1999) ["Prison officials 'should be accorded wide-ranging deference in adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security'"] (quoting Bell v. Wolfish, 441 U.S. 520, 547 (1979)); Overton, 539 U.S. at 132 ["We must accord substantial deference to the professional judgment of prison administrators, who bear significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them"].  This claim, therefore, is also without merit.

### **Conclusion**

Based on the foregoing, it is recommended that the Plaintiff's motion for summary judgment be **denied**, that the Defendants' motion for summary judgment be **granted**, and that this case be **dismissed.**  If the Court adopts this recommendation, Plaintiff's motion for injunctive relief will be **moot**.

The parties are referred to the Notice Page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

Columbia, South Carolina

May 23, 2006



### Notice of Right to File Objections to Magistrate Judge's Report and Recommendation
### &
### The Serious Consequences of a Failure to Do So

The parties are hereby notified that any objections to the attached Report and Recommendation (or Order and Recommendation) must be filed within ten (10) days of the date of its filing. 28 U.S.C. § 636 and Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three days for filing by mail. Fed. R. Civ. P. 6. Based thereon, this Report and Recommendation, any objections thereto, and the case file will be delivered to a United States District Judge fourteen (14) days after this Report and Recommendation is filed. Advance Coating Technology, Inc. v. LEP Chemical, Ltd., 142 F.R.D. 91, 94 & n. 3 (S.D.N.Y. 1992). A magistrate judge makes only a recommendation, and the authority to make a final determination in this case rests with the United States District Judge. See Mathews v. Weber, 423 U.S. 261, 270-271 (1976); and Estrada v. Witkowski, 816 F. Supp. 408, 410 (D.S.C. 1993).

During the ten-day period, but not thereafter, a party must file with the Clerk of Court specific, written objections to the Report and Recommendation, if he wishes the United States District Judge to consider any objections. Any written objections must *specifically identify* the portions of the Report and Recommendation to which objections are made *and* the basis for such objections. Failure to file written objections shall constitute a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the United States District Judge. See United States v. Schronce, 727 F.2d 91, 94 & n. 4 (4th Cir.), *cert. denied*, Schronce v. United States, 467 U.S. 1208 (1984); and Wright v. Collins, 766 F.2d 841, 845-47 & nn. 1-3 (4th Cir. 1985). Moreover, if a party files specific objections to a portion of a magistrate judge's Report and Recommendation, but does not file specific objections to other portions of the Report and Recommendation, that party waives appellate review of the portions of the magistrate judge's Report and Recommendation to which he did not object. In other words, a party's failure to object to one issue in a magistrate judge's Report and Recommendation precludes that party from subsequently raising that issue on appeal, even if objections are filed on other issues. Howard v. Secretary of HHS, 932 F.2d 505, 508-509 (6th Cir. 1991). See also Praylow v. Martin, 761 F.2d 179, 180 n. 1 (4th Cir.)(party precluded from raising on appeal factual issue to which it did not object in the district court), *cert. denied*, 474 U.S. 1009 (1985). In Howard, supra, the Court stated that general, non-specific objections are *not* sufficient:

> A general objection to the entirety of the [magistrate judge's] report has the same effects as would a failure to object. The district court's attention is not focused on any specific issues for review, thereby making the initial reference to the [magistrate judge] useless. * * * This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrates Act. * * * We would hardly countenance an appellant's brief simply objecting to the district court's determination without explaining the source of the error.

*Accord* Lockert v. Faulkner, 843 F.2d 1015, 1017-19 (7th Cir. 1988), where the Court held that the appellant, who proceeded *pro se* in the district court, was barred from raising issues on appeal that he did not specifically raise in his objections to the district court:

> Just as a complaint stating only 'I complain' states no claim, an objection stating only 'I object' preserves no issue for review. * * * A district judge should not have to guess what arguments an objecting party depends on when reviewing a [magistrate judge's] report.

See also Branch v. Martin, 886 F.2d 1043, 1046 (8th Cir. 1989)("no de novo review if objections are untimely or general"), which involved a *pro se* litigant; and Goney v. Clark, 749 F.2d 5, 7 n. 1 (3rd. Cir. 1984)("plaintiff's objections lacked the specificity to trigger *de novo* review"). This notice, hereby, apprises the parties of the consequences of a failure to file specific, written objections. See Wright, supra,; and Small v. Secretary of HHS, 892 F.2d 15, 16 (2nd Cir. 1989). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing addressed as follows:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

19

